

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00139-CV

IN THE INTEREST OF K.K.J. AND
D.K.S.

----------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Appellant S.S. (Mother)

appeals the trial court's order terminating her parental rights to her sons K.K.J.

and D.K.S. In a single issue, Mother argues that the evidence is legally and

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal was filed).

factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of her children. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the termination trial on March 11, 2013, Mother was in jail awaiting trial on charges of injury to a child, her son D.K.S., that had allegedly occurred on or about March 13, 2012. Because Mother challenges the best-interest finding, we will detail the evidence presented at the termination trial.

### A. The Injuries

Dr. Floyd Ota, a pediatric emergency medicine physician at Cook Children's Medical Center, testified that on March 13, 2012, D.K.S., a thin three-month-old boy, presented in the emergency room with swelling to his right ear that was caused by a blood clot.[3] Mother told Dr. Ota that the ear injury may have been caused by a bug bite because the area on the ear had started off as a small bump and had gotten bigger, but Dr. Ota testified that the ear injury was not a bug bite because the area was not warm. Dr. Ota said that the injury was consistent with nonaccidental trauma for a child D.K.S.'s age. Dr. Ota testified that "a significant amount of blunt force" was required for the injury to occur. Dr. Ota stated that an ear injury like the one that D.K.S. presented with is most commonly seen with wrestlers or mixed martial artists who get hit in the ear by a

---

[3]Mother brought D.K.S. to the emergency room after taking him to his pediatrician and being referred to the emergency room.

"significant blow." Dr. Ota testified that D.K.S. would have experienced significant pain at the time the blow was inflicted.

Dr. Ota said that imaging studies revealed that D.K.S. had multiple fractures. D.K.S. had bilateral metaphyseal fractures in the shin bones in both of his legs, which are fractures that are specific to inflicted injury and are often caused by a significant rotational force and shearing force on the bones. Dr. Ota testified that it was possible that the injury could have been sustained during a diaper changing if significant rotational force was used, but he testified that these were not accidental injuries.

D.K.S. also had metacarpal fractures to one hand; because D.K.S. was not mobile, these injuries were considered to have been intentionally inflicted. D.K.S.'s posterior right third through seventh ribs had fractures, which Dr. Ota testified were caused by an intentionally inflicted injury and were consistent with child abuse. Dr. Ota said that D.K.S.'s rib fractures would have been caused by "a squeezing of the torso, of the chest itself." The rib injuries could not have been caused by a two-year-old child because to Dr. Ota's knowledge, "you have to be able to wrap your . . . hands around the child." Dr. Ota also did not believe that a three-year-old child or a four-year-old child would have enough strength capacity to wrap his arms around the chest of a baby and squeeze it hard enough to fracture the ribs.

Other than the ear injury, Mother did not give clear answers to any of the injuries found on D.K.S. Dr. Ota testified that none of the injuries are consistent

3

with a fall and that the injuries could not have been caused by falling off a mattress that was approximately eight inches off the ground. Dr. Ota also testified that D.K.S.'s fractures "are not the type of fractures you might see with brittle bone disease." Dr. Ota did not know specifically what had caused D.K.S.'s injuries, but Dr. Ota opined that "there was definitely some kind of inflicted injury on this child with the -- if you take all the injuries into consideration with the auricular hematoma and the multiple fractures, different ages[,][4] and the specific type of fractures."

In addition to the hematoma and the multiple fractures, D.K.S. was failing to thrive because he had gained only about ten grams per day since he was born instead of the normal twenty to thirty grams per day. D.K.S. weighed approximately seven pounds at birth and weighed approximately nine pounds three and a half months later, instead of twelve to fourteen pounds. There were no biological reasons for D.K.S.'s low weight gain. Dr. Ota testified that it is possible that a parent could mix formula and feed the child appropriately based on the label's instructions but that the child does not gain much weight because he needs a higher concentration of formula.

## B. The Investigation and the Removal

Andreas Lebensieg, an investigator with the Department of Family and Protective Services, testified that the Department had received a referral on

---

[4]Dr. Ota opined that the injuries were "at least a few weeks" old.

March 13, 2012, for both D.K.S. and K.K.J. due to possible physical abuse of D.K.S. and his failure to thrive. Lebensieg met with a detective of the Crimes Against Children section of the Fort Worth Police Department and then went to Cook's and met with Dr. Ota, who explained the injuries that D.K.S. had suffered.

Lebensieg also met with Mother, who said that she was the sole caregiver for D.K.S. but that she did not know exactly how D.K.S.'s injuries had occurred. Mother told Lebensieg that she thought D.K.S.'s ear injury was caused by a bug bite or a spider bite. Mother's only explanation for the other injuries was that one and a half to two weeks prior to March 13, she had left D.K.S. in a room and returned to find that he had rolled off a mattress that was on the floor on the carpet.[5] Mother did not indicate that D.K.S.'s injuries had been caused by K.K.J. Mother could not give an explanation for D.K.S.'s small size, though she admitted to drinking alcohol before she knew that she was pregnant.[6] Mother told Lebensieg that she had fed D.K.S. six to eight ounces every three to four hours, that she had mixed milk with cereal, and that he had kept his food down.

Lebensieg testified that the Department could not identify who lived in the home with Mother or where she lived; Mother said that she lived with someone who went by the street name "G" and that the home was somewhere in south

---

[5]The hospital records state that Mother "denies any fallings or being dropped."

[6]Mother did not discover that she was pregnant until she was six or seven months along.

Fort Worth. Mother said that prior to living with "G," she lived with "Stacey" for almost two weeks prior to March 13 but had no address or phone number for her and did not know her real name. Mother indicated that D.K.S. and K.K.J. lived with her at Stacey's and then lived with her at "G's." Lebensieg testified that Mother was very evasive "about everything"[7] and especially in leading the Department to the people who were keeping K.K.J. while Mother and D.K.S. were at the hospital.

The Department decided to remove K.K.J. on March 13, 2012.[8] The Department ruled the case as reason to believe for physical abuse of D.K.S. by Mother and as reason to believe for physical neglect of D.K.S. by Mother. The physical neglect of K.K.J. was unable to be determined.

In Lebensieg's opinion, Mother did not seem surprised that the Department was making allegations that she had physically abused D.K.S. Mother expressed to Lebensieg that she wanted D.K.S. to get better.

---

[7]Mother initially stated that she has two children; during the course of the investigation, Lebensieg determined that Mother has five biological children, but only two were living with her at the time of the referral. At trial, Mother testified that in 2010, her oldest child left her care because Mother was evicted from her apartment for not paying rent; Mother was working but was not making enough to pay the bills. Mother testified that her son D.G. went to live with his father when he was nine or ten months old because that "was just what [the father] wanted," and Mother agreed to it. Mother testified that her daughter K.M. lives with her aunt and has been there since 2008.

[8]Hospital records reveal that D.K.S. underwent surgery on March 18, 2012, to drain the hematoma in his ear. He was discharged on March 19, 2012, and went home with foster parents.

## C. Mother's Testimony[9]

Prior to having K.K.J. and D.K.S. removed from her care, Mother had pre-enrolled in Tarrant County College and was planning to get her business degree, was taking steps to get her children into daycare, was taking some classes for Temporary Assistance for Needy Families (TANF) every week, and had obtained employment with Jimmy John's. Mother was supposed to start her job on May 2, 2012, but she was arrested at a visit on that date and has been in jail ever since.

Mother testified that she had completed ninth grade. Mother testified that her previous employment included working as a stripper at Bottoms Up for a month or two and that she had also worked as a cashier at Albertson's, as a housekeeper at the Radisson Hotel, and on an assembly line at Nokia and Motorola. The last time that Mother had employment was a part-time job from January 2010 to February 2010 at American Insurance Consultants. Since D.K.S. was born on December 1, 2011, Mother has not been employed. Mother testified that she had received government assistance in the form of food stamps and TANF in 2010; neither she nor her children receive Social Security benefits.

Mother testified regarding her drug and alcohol use. Mother said that she had used marijuana once in her twenties;[10] she was thirty-one at the time of the

---

[9]Mother pleaded the Fifth Amendment with regard to most of the questions related to D.K.S.'s injuries, only testifying that she was not aware of any of D.K.S.'s injuries other than the "bug bite." The bulk of her testimony provided background information on her life prior to the removal and on her plans for after her release from jail.

termination trial. Prior to her incarceration, Mother drank a couple of alcoholic drinks per month; she drank Smirnoff and Blast. Mother admitted that D.K.S. and K.K.J. were present when she drank. Mother said that she did not drink to the point of intoxication and that if she had ever been drunk, she did not show it and had no side effects.

Mother, who has never been married, discussed her prior relationships and testified that she had been friends with "G"[11] for eleven years and had reconnected with him in July 2011. Mother testified that "G" does not work; he receives an SSI check each month. He wakes up about 1:00 or 2:00 in the afternoon because he stays up late playing video games and talking to his family. Mother said that she was in a relationship with "G" when D.K.S. came into foster care.[12] Mother testified that she is 100% sure that "G" did not cause the injuries to D.K.S. Mother testified that the most unsupervised contact that "G" had with D.K.S. was twenty minutes; she said that "G" did not want to watch D.K.S. because he was so little. When "G" had unsupervised contact with D.K.S., Mother did not observe any injuries on him or find him crying when she returned.

---

[10]On March 13, 2012, Mother's oral swab drug test was negative, though Mother had indicated during her conversation with Lebensieg that she uses THC and marijuana once in a while.

[11]Mother provided "G's" full name for the first time at trial.

[12]Mother testified that her relationship with "G" had not ended but that she was not in regular contact with him.

8

Mother testified that she had met Stacey[13] when she had moved in with "G" in July 2011. Mother explained that Stacey is "G's" brother's girlfriend and is the mother of "G's" brother's daughter. Mother testified that K.K.J. was two and that she had allowed Stacey to be around him. Mother testified that Stacey does not have any CPS history or any criminal history, but Mother admitted that she would not know what name to look under to see if that were true. Mother testified that she is 100% sure that Stacey did not cause the injuries to D.K.S. that resulted in the removal because she did not watch him for long periods of time. Mother explained that Stacey had watched D.K.S for only ten or fifteen minutes and that when Mother returned, he was not crying and did not seem uncomfortable.

Mother testified regarding her housing. She said that she had initially lived with "G" and Stacey, and then about a week before March 13, Mother, her children, and "G" had moved in with "G's" mother Henrietta. Mother testified that she rode with Lebensieg to pick up K.K.J. from "G" and Henrietta on March 13.[14]

Mother testified that she has no current plans to resume her relationship with "G" when she is released from jail. She testified that her focus is on getting a job, getting a place to live, and "doing stuff for [herself]."

---

[13]Mother did not provide the Department with Stacey's full name until trial.

[14]Mother testified that she does not have a driver's license; in an emergency, she would rely on her mother Doris.

9

## D. Caseworker's Testimony

Julie Jacobson, the caseworker assigned to the case on March 20, 2012, testified that both K.K.J. and D.K.S. were in foster care in separate homes when she received the case. Jacobson testified that within the first two weeks of getting the case, she moved the children to a foster home where they could be together.

Jacobson met with Mother, who signed her service plan on March 28, 2012. Mother's service plan required her to attend and complete counseling, to complete a parenting education program, to complete a psychosocial psychiatric assessment, to maintain safe housing, to maintain employment or provide proof of ability to provide for her family, to attend an educational program at The Shaken Baby Alliance, to attend visitations with her children, and to submit to random drug testing. Between March 28 when she signed the service plan and May 2 when she was arrested, Mother had completed her psychosocial assessment, had attended four counseling sessions, and had attended her visits.

Jacobson noted that Mother was "very reserved" in her conversations with Jacobson. In June, Mother told Jacobson that there were times when she had left her children at the residence and had "walked down to get something to eat." Mother asked Jacobson repeatedly on multiple visits why D.K.S. did not cry more if he were injured.

Jacobson testified that the children have flourished with the stability provided in their foster home. Both children have minor allergy/asthma

symptoms. K.K.J. has no special physical or mental health needs; he is doing well in the foster home.[15] D.K.S. is "doing excellent"; he is still being seen by a pediatrician on a regular basis and is growing. He gained three pounds after being with the foster mother for two and a half weeks.[16]

Jacobson testified that Mother was a danger to her children when they were brought into foster care and that the danger was not reduced between the time that the children came into foster care and the time that Mother was taken into custody. Mother is currently incarcerated on a felony charge of injury to a child and will potentially be out of the children's lives for a very long time. Jacobson was concerned about the children ever being returned to Mother because Mother was unable to meet the children's physical and emotional needs and because based on her past employment and housing history, Mother would not be able to meet the children's future physical needs.

Jacobson asked the trial court to terminate Mother's parental rights to D.K.S. and K.K.J. and testified that termination is in the children's best interest. Jacobson opined that it is in the children's best interest to remain in the current foster placement. Jacobson testified that the foster parents want to adopt both

[15]The family service plan noted that as of March 27, 2012, K.K.J. was speech delayed when he came into foster care; as of August 17, 2012, his speech "has made tremendous progress with daily coaching and interaction from the foster parents."

[16]Medical records revealed that D.K.S. had gained thirty-three grams per day from his discharge from the hospital on March 19, 2012, until his checkup on April 10, 2012. Significant healing of his rib fractures was noted.

11

boys, that the foster parents are able to meet the children's present and future needs, that she had no concerns about the foster parents' parenting abilities, and that there are programs available to assist the adoptive parents if the termination is granted.

### E. Ad Litem's Recommendation

Mike Berger, the children's attorney ad litem, argued in his closing argument that D.K.S.'s injuries were not accidental; that if Mother had not caused them, then she had left D.K.S. with someone who had caused them; that to leave the children with Mother would be to wait for more injuries; that the children are doing "wonderfully well" in their foster home; that Mother had lived a nomadic lifestyle; and that Mother had engaged in dangerous occupations. Berger recommended that the trial court terminate Mother's parental rights to K.K.J. and D.K.S.

### F. Trial Court's Disposition

After hearing the above testimony and reviewing the evidence, the trial court found by clear and convincing evidence that Mother had violated subsections (D), (E), and (O) of Texas Family Code section 161.001(1) and that termination of Mother's parental rights to K.K.J. and D.K.S. is in the children's best interest. This appeal followed.

### III. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS BEST-INTEREST FINDING

In her sole issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of her children. Specifically, Mother argues that insufficient evidence was introduced at trial indicating that she would not be able to adequately provide for the emotional, physical, mental, or spiritual needs of the children now or in the future; that she had not demonstrated her parental abilities; and that she was not taking advantage of the programs offered to assist her.

### A. Burden of Proof and Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.*; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment.

14

*Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

15

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).[17]

---

[17]Because Mother's appellate brief references and utilizes only the *Holley* factors in her analysis, we focus on these factors rather than the statutory factors.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis of Evidence Under the *Holley* Factors

Mother focuses her combined legal and factual sufficiency argument on three of the *Holley* factors: the children's emotional and physical needs now and in the future; the parental abilities of the individuals seeking custody; and the programs available to assist those persons in promoting the best interest of the children. We will weigh each of the nine factors set forth above.

At the time of the termination trial, K.K.J. was three and a half years old, and D.K.S. was fifteen and a half months old. The record is silent regarding K.K.J.'s and D.K.S.'s desires. However, the fact that Mother had not visited with the children in ten months due to her incarceration supports a conclusion that there is little, if any, emotional bond between the children and Mother. *See In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.). The trial court was entitled to find that this factor weighed in favor of termination.

Mother argues that the evidence presented at trial is insufficient to indicate that she would not be able to adequately provide for the emotional, physical, mental, or spiritual needs of the children now and in the future. The record,

17

however, reveals that Mother had not shown stable employment and was unemployed at the time the children were removed, had not provided stable housing, had not provided adequate nutrition for D.K.S., and had not provided a safe environment for the children. The record further revealed that Mother had no way to provide for the future needs of her children because she was in jail awaiting trial on charges of injuring D.K.S. Without stability, income, or a home, a parent is unable to provide for children's emotional and physical needs. *See A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.). The trial court was entitled to find that this factor weighed in favor of termination.

With regard to the emotional and physical danger to the children now and in the future, the record reveals that Mother was the sole caretaker for the children when D.K.S. presented in the emergency room with nonaccidental injuries to his ear, his hand, his shins, and his ribs and was diagnosed as failure to thrive; Mother was incarcerated at the time of the termination trial for charges related to D.K.S.'s injuries. A factfinder may infer from past conduct endangering the well-being of the children that similar conduct may recur if the children are returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). The trial court was entitled to find that this factor weighed in favor of termination.

The record demonstrates that Mother lacks the parenting abilities necessary to parent her children. As set forth above, Mother was incarcerated at

18

the time of the termination trial on charges related to D.K.S.'s injuries and had not visited with the children in ten months. Moreover, at the time of the removal, Mother's three other biological children were no longer living with her and had limited contact, if any, with her. The Department had no concerns about the foster parents' parenting abilities. The trial court was entitled to find that this factor weighed in favor of termination.

Jacobson testified that the foster parents had provided a stable home where the children had flourished, that the foster parents wanted to adopt the children, and that there are programs available to assist the foster parents if the termination is granted. Due to Mother's incarceration, she had no evidence of a stable home; instead, her plans were contingent on getting out of jail, at which time she planned to focus on getting a job, getting a place to live, and "doing stuff for [herself]." The trial court was entitled to find that these three factors weighed in favor of termination.

The record, as set forth in detail above, is replete with evidence of Mother's acts and omissions that showing that her parent-child relationship with K.K.J. and D.K.S. is not positive. Moreover, the trial court was entitled to disbelieve Mother's explanations for D.K.S.'s injuries, which Dr. Ota testified were intentionally inflicted and were consistent with child abuse. The trial court was entitled to find that these two factors weighed in favor of termination.

After weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is both legally and factually sufficient to support the trial court's

finding that termination of Mother's parental rights to K.K.J. and D.K.S. is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *see also A.S.*, 394 S.W.3d at 714–16 (holding evidence legally and factually sufficient to support best-interest finding because father was in jail, had failed to support child, had failed to take advantage of available programs, and had demonstrated an inability to offer stability or permanence to his child). We overrule Mother's sole issue.

## IV. CONCLUSION

Having overruled Mother's sole issue, we affirm the trial court's judgment terminating her parental rights to K.K.J. and D.K.S.

SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DELIVERED: August 22, 2013

20